Whalet, Chief Justice,
delivered the opinion of the court:
This suit is for the recovery of the difference between compensation for transporting mails on a foreign ocean mail route computed under a contract therefor and the amount allowed and paid by the Comptroller General computed on a poundage basis.
Plaintiff and defendant entered into a contract dated March 21, 1930, whereby the plaintiff, among other things, agreed to carry ocean mails of the United States from New York by Havana, Cuba, and Cristobal, Canal Zone, to Port Limón, Costa Eica, “on a schedule approved by the Postmaster General, that shall include” certain approximate *104 annual trips. The route so described was known and designated as Route #40.
This contract was based on the Merchant Marine Act, 1928, 45 Stat. 689, chap. 675, which empowered the Postmaster General to enter into contracts, after advertisements and bids, to carry mails on certain designated routes between the United States and foreign countries. The act fixed certain rates to be allowed on vessels according to their speed and these vessels had to be built under the terms of the act, which specified in Section 405 (b) that the vessels should be constructed
(1) according to plans and specifications approved by the Secretary of the Navy, with particular reference to economical conversion into an auxiliary naval vessel, or
(2) a vessel which will be otherwise useful to the United States in time of national emergency.
Under Section 402 of the act, the Postmaster General was required to certify to the United States Shipping Board what ocean mail routes should be established and have vessels documented under the laws of the United States to carry merchandise, distributed so as equitably to serve the Atlantic, Mexican Gulf, and Pacific coast ports.
In response to the advertisements by the Postmaster General, plaintiff entered a bid which was accepted on Route 40. Plaintiff had also entered into a contract with the Postmaster General for the carrying of the ocean mail on Route 39, commencing from a port on the west coast and continuing to South American ports.
Under the contract for service on Route 40, plaintiff agreed to operate vessels of Class 5 capable of a speed of 13 knots. Under paragraph (h) of Section 1, plaintiff was required to substitute as soon as practicable after the beginning of the service, and not later than three years from the date of the contract, three new combination passenger and cargo vessels of Class 4, capable of maintaining a speed of 16 knots. The contract provided also that vessels should be classified on the basis of speed without regard to tonnage with the consent of the Postmaster General. It further provided that the plaintiff might substitute and operate vessels in Class 4 and other classes in addition to those specified in Section 1, paragraphs *105 (g) and (li) of the contract in such way and for such purposes as might be agreed upon by the parties.
It appears from the evidence that the plaintiff had entered into a contract for the construction of six vessels to be built in the United States under the terms and conditions of the “Merchant Marine Act, 1928” and that on March 8 the Postmaster General requested plaintiff to furnish a list of the steamers which would operate on Route 40 at the commencement of service. At this time the plaintiff had had delivered to it, or about to be delivered to it, two new vessels of the six ordered to be constructed by plaintiff. By letter dated March 11,1932, plaintiff notified the Post Office Department that it proposed to operate the new S. S. Chiriqui as the first sailing on this route to depart from New York on March 24 and at the completion of the outward bound trip to Port Limón this ship would proceed to San Francisco to begin operation on Route 39. Plaintiff also proposed the sailing on April 3 of the new S. S. Antigua on the same route for one voyage, this ship thereafter to be placed on Route 39. Both of these ships were new vessels and their actual speed was unknown. After the exchange of letters between the Post Office Department and plaintiff in which permission was asked for the approval of the sailing of these vessels on the outward bound voyage on Route 40 and their subsequent service on Route 39, the Department notified plaintiff that the final schedules as submitted by the plaintiff were satisfactory. Both of these vessels sailed on the dates furnished the Post Office Department and carried the ocean mail to the ports specified in the schedule and then proceeded to San Francisco, California, for service on Route 39.
The logs of the ships were submitted to the Post Office Department as the basis upon which to calculate the speed of the vessels and, upon this calculation, to fix the rate of pay for the ocean mail carried according to the schedule set out in the act of 1928 and the contract entered into between the plaintiff and the defendant. As a result of this calculation the Post Office Department certified to the General Accounting Office that the plaintiff was entitled to be paid on the basis of the rate fixed on Class 4 vessels with a speed of 16 knots, which carried the rate of $6.00 per nautical mile, and had *106 therefore earned the sum of $28,572.00, as payment for services rendered in carrying the ocean mail. The Comptroller General disregarded the classification on these vessels and treated them as Class 5 vessels, which allowed only $4.00 per nautical mile, and issued warrants aggregating $19,048.00 to the plaintiff in payment of the service rendered. Plaintiff refused to accept and asked for a reconsideration, returning the warrants. The Comptroller General reconsidered the matter, cancelled the warrants, and issued a new warrant in the sum of $908.31, based on poundage rates.
It is admitted by the defendant that the calculation on the poundage basis is erroneous. However, it is contended that the plaintiff is not entitled to receive payment under Class 4 but only on Class 5 with the rate of $4.00 per nautical mile instead of $6.00. This brings us to an interpretation of the contract.
Plaintiff was required under paragraph (h) of Section 1 to substitute as soon as practicable after the beginning of service specified in this contract, and no later than three years from the date on which the same was awarded, three new combination passenger and cargo vessels of Class 4 with a speed of 16 knots. The advertisements for bids referred to and made a part of the contract provided:
The contractor and the Postmaster General may agree upon the operation of additional vessels of Class 4 and/or other Classes.
The evidence plainly shows that plaintiff was endeavour-ing to carry out the intent and purpose of the act of 1928 in having these two new ships constructed and that the Postmaster General had agreed that they be used on the outward bound voyage and carry the mail under the contract. As the actual speed of these vessels was unknown, it was necessary for their logs to be submitted to the Postmaster General and a calculation made as to the speed maintained on the voyage in order to fix the basis of the. rate of pay as provided in the contract.
The Post Office Department found as a fact that these vessels belonged in Class 4 and that their speed, as shown by the logs, was 16 nautical knots, and therefore allowed the plaintiff the rate of pay as provided in the contract for *107 vessels of Class 4. We can find nothing in the contract or the evidence which requires Class 5 vessels to first be put on a route and then vessels of a higher rate of speed substituted thereafter. The act and the contract only provided that such substitution should be made three years after the contract had been entered into. There was nothing to prohibit the plaintiff from providing and operating on the initial trip a vessel with a speed over 13 knots, or the Post Office Department from accepting such service. The vessel of course had to be capable of maintaining 13 knots.
There is nothing in the contract which requires any substitution at any particular time. The defendant received the benefit of this higher rate of speed and quicker delivery on ships which had been specially built under the terms of the Merchant Marine Act, and the Postmaster General had the power and the right under this act to make the calculation on the speed of the vessel as determined by him. (Sec. 408, Merchant Marine Act, supra.)
. We can find no justification for the Comptroller General’s application of a rate and classification lower than that certified to him by the Post Office Department and provided by the contract.
Plaintiff is entitled to recover the difference between the amount allowed by the Comptroller General and the amount due plaintiff under the higher rate, or the sum of $27,663.39. It is so ordered.
Littleton, Judge; and Green, Judge, concur.
Whitaker, Judge, took no part in the decision of this case.